## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No.  17-00045-KD |
| | * | |
| JEFFERY MASON BAISCH | * | |

### PLEA AGREEMENT

The abovecaptioned defendant, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.      The defendant understands his rights as follows:

  a.      To be represented by an attorney;

  b.      To plead not guilty;

  c.      To have a trial by an impartial jury;

  d.      To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

  e.      To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.      The defendant waives rights b through e, listed above, and pleads guilty to Count 1 of the Indictment, charging a violation of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute methamphetamine ice.

3.      The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false

statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4. The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5. The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6. The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7. The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8. A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or

Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.     This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.  There have been no promises from anyone as to the particular sentence that the Court will impose.  The defendant is pleading guilty because he is guilty.

10.    The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.  This waiver includes, but is not limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

## PENALTY

11.    The maximum penalty the Court could impose on Count 1 of the Indictment is:

a.     10 years to life imprisonment;

b.     A fine not to exceed $10,000,000;

c.     A term of supervised release of 5 years, which would follow any term of imprisonment.  If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

d.     A mandatory special assessment of $100;

e.     Criminal forfeiture.

## SENTENCING

12.     The Court will impose the sentence in this case.  The United States Sentencing Guidelines are advisory and do not bind the Court.  The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation.  The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines.  The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.     The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.     The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation.  Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.     Both the defendant and the United States are free to allocute fully at the time of sentencing.

16.    The defendant agrees to tender $100 to the U.S. District Court Clerk in satisfaction of the mandatory special assessments in this case. The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## FORFEITURE

17.    The defendant agrees to confess the forfeiture to the United States of all properties which represent proceeds of his criminal activities or which facilitated any aspect of these illegal activities.

## FINANCIAL OBLIGATIONS

18.    The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

19.    The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment and will move to dismiss all remaining counts once sentence is imposed. This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not

bind any other federal, state, or local prosecuting authorities.

20.    The United States will recommend to the Court that the defendant be sentenced at the low end of the advisory sentencing guideline range as determined by the Court.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

21.    The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion. If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

a.    The defendant shall fully, completely, and truthfully respond to all questions put to him by law enforcement authorities regarding the underlying facts of the offense(s) with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

b.    The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether law enforcement authorities question him specifically about any such offense. This provision requires the defendant to divulge all information available to him even when law enforcement authorities do not know about the defendant's involvement, knowledge or information relating to any

particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.      The defendant agrees to cooperate completely with all law enforcement authorities in any matters to which his cooperation may be deemed relevant by any law enforcement authority. The defendant agrees to fully comply with all instructions from law enforcement authorities regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.      If the United States deems it necessary, the defendant may be required to take a polygraph examination(s) which will be administered by a government polygrapher. The defendant agrees that the results of any polygraph examination may be used by the United States in its evaluation of whether there has been substantial assistance, and are admissible at sentencing to rebut an assertion by the defendant of bad faith or unconstitutional motive on the part of the United States.

e.      The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the

charged offense.  This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

f.    The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

g.    If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable.  The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation. The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with law enforcement authorities does not constitute

substantial assistance. The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States will not make a motion for downward departure. If the defendant's effort to cooperate with the United States does not amount to substantial assistance as determined solely by the United States, the United States agrees to recommend that the defendant receive a sentence at the low end of the advisory guideline range.

h.    The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, refusing to take a polygraph examination, failing a polygraph examination, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1)    permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)    permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect,

in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

i.   Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his cooperation. The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

j.   The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter. His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement. Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

## LIMITED WAIVER OF RIGHT TO APPEAL AND
## WAIVER OF COLLATERAL ATTACK

22.  As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255. Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence (including a sentence imposed on revocation of probation or supervised release) in any district court or appellate court proceedings.

    a.  **EXCEPTIONS.**  The defendant reserves the right to timely file a direct appeal challenging:

        (1)  any sentence imposed in excess of the statutory maximum;

        (2)  any sentence which constitutes an upward departure or variance from the advisory guideline range.

    In addition, the defendant further reserves the right to claim ineffective assistance of counsel in a direct appeal or a petition filed pursuant to Title 28, United States Code, Section 2255.

23.  If the United States files a notice of appeal and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver.

24.  The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

25.  If the defendant receives a sentence within or below the advisory guideline range,

this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

## **VIOLATION OF AGREEMENT**

26.    The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant.  In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge.  In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

27.    In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## **ENTIRETY OF AGREEMENT**

28.    This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,

STEVE BUTLER
ACTING UNITED STATES ATTORNEY

Date: 5/3/17

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 5/2/17

Gloria A. Bedwell
Assistant United States Attorney


I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 6-13-2017

Jeffery Mason Baisch
Defendant


I am the attorney for the defendant. I have fully explained his rights to him with respect to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 6-13-2017

Neil Hanley, Esq.
Defense Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Criminal No. 17-00045-KD** |
| | * | |
| **JEFFERY MASON BAISCH** | * | |

### FACTUAL RESUME

The abovecaptioned defendant admits the allegations of Count 1 of the Indictment.

### ELEMENTS OF THE OFFENSE

**Count One:**   The defendant understands that in order to prove a violation of Title 21, United States Code, Section 846, conspiracy to possess with intent to distribute methamphetamine, the United States must prove the following beyond a reasonable doubt:

First, that two or more individuals came to a mutual understanding to commit an unlawful act, in this case, the possession with intent to distribute controlled substance; and second, that the defendant, knowing of the unlawful purpose of the plan, knowingly and intentionally joined in the plan.   The government must also prove that the offense involved more than 50 grams of methamphetamine.

### OFFENSE CONDUCT

The defendant admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case.   This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for his plea of guilty.   The statement of facts does not contain each and every fact known to the defendant and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

**Facts**

1

In November of 2016, the Baldwin County sheriff's office and the FBI task force received information from a cooperating defendant which implicated several subjects in Baldwin County.   Cooperating Defendant 1 (CD1) identified Donnie and Daryl Thomas as two subjects who used, sold and traded drugs regularly.   Donnie Thomas was identified as a subject who received a quarter-ounce of meth ice every two days during a three- to four-month period during 2015.   CD1 also identified Cameron Michanowicz as a subject who lived on Japonica Street in Pensacola.   CD1 had been to Michanowicz's residence with another subject and they saw 15 to 20 ounces of meth there.   CD1 bought a half-ounce from him for $450, and subsequently returned to purchase another .75-ounce for $700.

CD2 told investigators that he/she met Michanowicz in November of 2015, and he/she began to deal with Michanowicz from that time through February of 2016.   CD2 was arrested near the beginning of March but was out for a little more than a week at the first of June in 2016. During that week, CD2 resumed dealings with Michanowicz, and usually purchased 1 to 4 ounces of meth ice at a time, at least two to three times per week.   CD2 stated that Michanowicz used his business to stash drugs and guns.   CD2 stated that Michanowicz concealed drugs in paint cans at the business.   CD2 had seen Michanowicz in possession of 4 kilograms of meth ice on occasion, and up to a pound of heroin at his business location.   CD2 had also seen up to one kilogram of meth ice and about an ounce of heroin at his residence once during 2016.   CD2 stated that Michanowicz would take guns in trade for drugs and that he/she had seen guns at his residence.

CD2 identified Jeff Baisch as Michanowicz's right-hand man.   CD2 stated that he/she has seen Baisch in possession of a pound of meth ice and an ounce of heroin at his residence.

CD2 also stated that Baisch had pistols and long guns, in spite of the fact that he was a convicted felon.   CD2 agreed to make trips for a source of supply in Georgia to pick up drugs and deliver them as needed.   CD 2 admitted to making deliveries of 4 to 10 kilograms of meth ice every week or every two weeks for about two years.   On one trip, CD2 transported 16 kilograms. CD2 delivered ounces to two subjects in Baldwin County four or five times.

CD 2 had been arrested during the summer of 2016.   CD2 made bond, but was arrested again in late July on drug and stolen property charges.   CD2 provided a post-Miranda statement to investigators admitting that CD2 had introduced Michanowicz to the supplier from Georgia. CD2 stated that Michanowicz purchased a kilogram from his as a result.   Michanowicz sold the kilogram in a day, and requited additional drugs.   CD2 told investigators that he/she and the supplier made three trips to Georgia and back in three days to get a kilogram of meth ice for Michanowicz on each trip.   After the first trip, CD2 stated that Michanowicz supplied Baisch with .5 to one pound of meth ice.

CD3 told investigators that he/she was dealing with a supplier for meth ice and that he/she met Michanowicz in about the middle of 2015 in Baldwin County at his/her residence. Within a week of their meeting, CD3 had arranged to provide Michanowicz with quarter-ounces of meth ice.   The amounts increased over two or three months through 2016.   CD3 fled Baldwin County to avoid arrest and was no longer in a position to supply meth ice in substantial quantities.   CD3 subsequently observed large amounts of meth ice at Michanowicz's shed. CD3 then began to get meth ice from Michanowicz, approximately 1 to 3 ounces at a time every other day for 3 months.   CD3 gradually introduced his distributors to Michanowicz to back out of the business.

CD3 also met Biasch through his original supplier.   CD3 supplied Biasch with 1 to 2 ounces on two or three occasions.   CD3 stated that Baisch believed he/she was charging too much.   Baisch was also getting meth ice from CD3's original supplier, and became one of that supplier's main distributors.   After that supplier finally got locked up, Baisch told CD 3 that he was getting meth ice from Michanowicz.   CD3 had seen Baisch in possession of two pistols at his house.

On November 9, 2016, the Baldwin County Drug Task Force executed a search warrant on North Hickory Street in Foley, at premises known as B & R Tires.   As officers approached to execute the search warrant, they observed Thomas enter a small utility shed on the east side of the property.   Investigators heard screaming coming from the office building and they elected to enter it first.   They found Klifton Adam Bond and his wife upon entry into the building.   As Bond was ordered to the floor by the officers, Bond slid a sunglasses case across the floor.   It was found to contain approximately 12 grams of meth ice.   Deputies found another bag of methamphetamine in Bond's wallet.   He had $729 in cash and a set of digital scales containing residue on his person. In the desk drawer in front of his wife, the officers found a meth pipe and three prescription bottles in her name.   One of the bottles contained no pills, but methamphetamine ice was inside.   There were also six Suboxone packages in her purse along with $2,000 in cash.   When Bond's wife was booked into the jail on state possession charges, the jailers found approximately a gram of meth ice concealed in her bra.

Another deputy approached the shed and observed Thomas near the entrance.   Thomas turned to run, and the deputy observed Thomas throw money to the side of the shed and discard a handgun from his pants leg as he appeared to consider running.   Thomas apparently changed his

mind and decided to get to the ground.   Deputies recovered the gun, approximately $145 in cash, a hypodermic syringe containing fluid, and approximately 1 gram of meth ice from the area near Thomas.  In the shed, deputies found approximately 27 grams of meth ice in a file cabinet drawer.   There was a line of meth ice laid out on the desk, a digital scale, small plastic baggies used to package meth, $53 in cash and a marijuana cigarette.

The deputies advised all the subjects of their rights.   Thomas stated at the scene that he was under the influence of methamphetamine and he frequently used methamphetamine.   He said he used the shed where the 27 grams of meth were found as an office.   He said he had slept in the shed for the past two nights because he was homeless.   He said the meth in the shed belonged to Bond.   He said he saw Bond bring the meth into the shed and he was aware that it was there.   Thomas stated that the gun was his and he got it from a guy three days earlier.   He would not identify the person from whom he got the gun.

Deputies interviewed Bond.   He said he used meth daily and was addicted to it.   He said he did not sell meth, but Donnie Thomas did sell it.   He said all the meth found on the premises belonged to Thomas, except for what was in his wallet and what was in his wife's purse.   He said the meth in his wallet and in his wife's purse belonged to him.   He said he put the meth in her purse.   He said he got his meth from Thomas, and Thomas had a source of supply for meth in Pensacola, Jeff Baisch. Bond stated that Thomas and two women bought meth from Baisch in Pensacola twice.   He did not know the total amount of meth purchased.   He stated that he gave Thomas $750 to purchase one ounce of meth from him, and Thomas returned and gave him the ounce.   Bond stated he did not lie it, so he gave it back to Thomas.   He said Thomas was going to sell it for him and give him the $750 back.   Bond stated that Thomas got meth from Baisch

about twice a week.   He thought Baisch had about 96 ounces of meth at the time of the interview.   Bond stated that since he returned the ounce to Thomas, all the meth on the premises belonged to Thomas.   Bond stated that the only exception was the gram in his wallet and the meth in his wife's possession.   He said the meth in her purse was also his.   During this interview, Bond denied possession of the meth in the sunglasses case, notwithstanding his earlier admission about it.

Bond stated that he personally had bought meth from Baisch twice.   The last time was the previous Thursday or Friday prior to the search.   He said he drove to Baisch's residence in Pensacola.   He said while he was there, a black male, small in stature, about 30 to 40 years old, arrived at Baisch's residence in a white Ford Crown Victoria.   He said the black male came inside the house and provided Baisch with an unknown amount of meth.   He said Baisch sold him one ounce of the meth for $750.   Bond stated the first time he bought meth from Baisch was about a month ago.   He stated that he picked Baisch up from his residence in Pensacola and drove him directly to the residence of his source of supply, which was an address on Gail Drive in Pensacola.   Bond stated that this was the same black male who he met during the most recent encounter and he believed it was the source's residence.

Thomas was interviewed on two subsequent occasions.   On August 9, 2016, Thomas was advised of his rights by investigators participating in the investigation.   He agreed to waive his rights to be interviewed.   Thomas identified a female meth ice dealer in Foley and stated that her suppliers were Cam Michanowicz and Jeff Baisch, and that the female usually gets between three to five ounce of meth from them.   He said Michanowicz and Baisch are in business together.   Thomas stated that he was with another female on two occasions when she purchased

6

meth ice from Baisch in quantities of 1.5 ounces one time and 3 ounces the other time.   Thomas

stated that he had been with a third female twice when she purchased meth ice from Baisch and

his roommate.   Thomas was not sure of the amounts of meth ice she bought on those occasions.

On August 23, 2016, TFO Drummond and Special Agent Kit Kelley met with Thomas to

obtain additional information.   In a post-Miranda statement, Thomas stated that he met Jeff

Baisch about three months ago through one of the women he mentioned in his previous

statement.   He said Baisch would deliver meth ice in Baldwin County and he had also meth

Baisch in Perdido Key, Florida, to pick up drugs from him.   On or about August 1, 2016,

Thomas met Baisch at a service station in Perdido Key, Florida, to purchase one ounce of meth

from Baisch for $850.   On or about August 5, 2016, Thomas met Baisch at the same location in

Perdido Key, Florida to get an ounce of meth for $850.

Agents and officers used a cooperating informant to make a controlled buy of meth ice

from Biasch on or about August 10, 2016.   Agents established surveillance at the service station

on Perdido Key Drive in Perdido Key, Florida, and the informant, who was equipped with

electronic device to record the transaction, met Biasch and obtained the drugs in exchange for

cash.   The informant met the agents at a prearranged location and they retrieved the equipment

and the drugs, approximately 26.1 grams of meth ice.

The agents had also made a controlled buy from Michanowicz on or about July 27, 2016,

using a cooperating informant.   The informant was likewise equipped with electronic devices to

record the contact with Michanowicz.   The informant traveled to Michanowicz's residence in

Pensacola and waited for him to arrive.   When he did, the informant told him that he wanted

"two or 17."   Michanowicz told the informant that they were $750 each.   The informant gave

Michanowicz the money, picked up the two ounces of meth ice Michanowicz provided, and left. The informant traveled to the prearranged location where the officers took possession of the drugs and the equipment.

On August 11, 2016, the agents and officers executed search warrants at several locations, including Michanowicz's and Baisch's residences in Pensacola.   At Michanowicz's residence, they seized five firearms, ammunition, handwritten notes, drugs, scales, drug paraphernalia, documents, cell phones, three computers and approximately $850 in cash. Michanowicz was advised of his rights and he agreed to waive his rights a make a statement. Michanowicz told the agents, among other things, that he was not a "big guy" in the drug business.   He stated that he sold three to five ounce of meth ice per week for six months.   He subsequently said this amount was 1 to 2 ounces per week.   However, when discussing the amount of meth ice he sold to Jeff Baisch, he stated he provide him with one to two ounce of meth ice per week for 3 months.   He also stated the Baisch bought drugs from him just as much as Baisch bought from Michanowicz.   The deals with Baisch occurred at his residence on Japonica Avenue, his business on West Navy Boulevard or at Baisch's residence.   Michanowicz identified one supplier from whom he stated he had purchased 8 to 10 ounce of meth ice on one occasion.

On the same date, a search warrant was executed on Biasch's residence on Canal Road in Pensacola.   Biasch was present as were several other subjects.   One of the others was in possession of .380 caliber pistol.   Three other guns were recovered from the residence, along with methamphetamine ice, a digital scale, ammunition, magazines for an AR-15, camo body armor, a digital scale, four phones, and a laptop computer.   Baisch was advised of his rights and

8

he agreed to make a statement.   He said he had been expecting to be arrested ever since a long-time supplier from whom he had received meth ice had been busted.   He said he had been dealing meth for about 18 months.   He said he had been supplied by that person for a long time, and he had gotten 8 ounces of meth from her once a week for more than a year.   He paid her $1,000 per ounce.   Baisch said he had known Michanowicz for 3 or 4 months.

During his introduction to Michanowicz, Baisch saw him in possession of a kilogram of meth ice.   Baisch bought an ounce of it for $900.   About two weeks later, Baisch bought more meth ice from Michanowicz.   Baisch identified one of his distributors who also got meth ice from Michanowicz.   According to Baisch, that subject moved about 10 ounces a day for Michanowicz.   Over the course of three to four months, Baisch purchased meth from Michanowicz about 10 times, 1 to 2 ounces at a time.   Biasch had seen Michanowicz in possession of multiple kilograms of meth ice, both at his residence and at his business.

Baisch stated that he had also obtained meth ice from another subject, CC1.   Baisch has known CC1 for about 1.5 years and CC1 supplied Baisch with 1 to 2 ounces of meth ice every couple of days for about two months.   CC1 received his drugs from a supplier in Houston, and he sold it to Baisch for $700 per ounce.   Baisch just met the supplier from Houston and Baisch stated that this subject just brought him 6 to 7 ounces of meth ice the previous night.

Baisch also identified another supplier who made trips to this area from Georgia every two days for the last two weeks, bringing 2 kilograms of meth ice each trip.   Baisch stated that the previous week, this supplier made the trip two days in a row, bring back 2 kilograms each time.   Baisch knew that this subject had been formerly dealing with Michanowicz.   Baisch believed that Michanowicz was not happy with him because he was dealing directly with the

9

supplier, thereby cutting Michanowicz out and competing with Michanowicz for drug sales at lower prices.   Baisch admitted he bought two ounces three to four times from that supplier.

Baisch identified several distributors who got meth ice from him and sold it Alabama. He estimated that there was about $7,000 in the house and his last employment was 8 or 9 months ago when he worked as a bartender.

Baisch was arrested at the Key West Inn in room 508 in Pensacola on state gun charges resulting for a search at the America's Best Value Inn in February of 2016.   Baisch bonded out and was arrested again on December 22, 2015, at which time he was advised of his rights by federal agents and agreed to give a statement.   He provided additional information about the guns found in his residence in August of 2016 during the execution of the search warrant described above.   Baisch admitted that he had traded drugs for one of the guns in the house.

The parties agree that Baisch is accountable for more than 15 kilograms but less than 45 kilograms of methamphetamine ice as relevant conduct, and that the Government can prove that amount beyond a reasonable doubt.

AGREED TO AND SIGNED.

Respectfully submitted,

STEVE BUTLER
ACTING UNITED STATES ATTORNEY

Date: 5/3/17

Vicki M. Davis, Criminal Chief
Assistant United States Attorney

Date: 5/2/17

Gloria A. Bedwell
Assistant United States Attorney

10

Date: 6-13-2017

Jeffery Mason Baisch
Defendant

Date: 6-13-2017

Neil Hanley, Esq.
Attorney for Defendant

11